IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DALE E. WALLACE, | CV 17-00103-H-BMM-JTJ |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| CONNIE WINNER, PAUL REES, DANIEL HASH, TRISTAN KOHUT, and CINDY HINER, | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgment
(Doc. 25). Mr. Wallace, a pro se prisoner, filed a Complaint on November 1, 2017
alleging Defendants were deliberately indifferent to his serious medical needs
when they delayed surgery for his broken jaw for approximately two years.
(Complaint, Doc. 2.) Having considered the parties' arguments and submissions,
Defendants have established there is no genuine dispute as to any material fact
regarding the merits of Mr. Wallace's claims against Defendants Winner, Rees,
Kohut, and Hiner. The motion for summary judgment should be granted as to
these Defendants and they should be dismissed. There is a genuine issue of
material fact regarding whether Defendant Hash was deliberately indifferent to
Mr. Wallace's serious medical needs from November 2014 through June 2016.

1

Summary judgment is not appropriate as to Mr. Wallace's claims against Dr. Hash.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Summary judgment should be entered,

"after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts

admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

By notice provided on December 8, 2018 (Doc. 27), Mr. Wallace was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957

(9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).[1]

## II.  FACTS

On January 3, 2014, Mr. Wallace was injured during his arrest in Oregon.

He was struck by a police vehicle and as a result fractured his right arm, left leg,

jaw and shattered numerous teeth.  (Complaint, Doc. 2 at 3, ¶ 12.)  Mr. Wallace

was admitted to the Oregon Health and Science University for emergency trauma

care.  (Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary

Judgment, Doc. 31; Defendants' Statement of Undisputed Facts, Doc. 26

(hereinafter "SUF" at ¶ 1.)).

Mr. Wallace was subsequently transferred to Montana State Prison (MSP)

and has been incarcerated there since October 7, 2014.  (SUF at ¶ 2.)  Upon his

arrival MSP he was placed in the Martz Diagnostic and Intake Unit (MDIU) and

given a "Receiving Questionaire [sic]" whereon he explained his dental problems

as, "many teeth knocked out or shattered – occurred on 1-3-14."  (SUF at ¶ 3.)

Mr. Wallace's MDIU intake also included being seen and evaluated by medical

---

[1]Local Rule 56(d) requires a party opposing a motion for summary judgment to file a statement of disputed facts addressing the moving parties' statement of undisputed facts.  Mr. Wallace filed a document entitled a statement of disputed facts but therein he addressed Defendants' disclosure statement and not Defendants' statement of undisputed facts.  Although this document does not technically comply with the Court's Local Rules, the Court has considered Mr. Wallace's assertions therein to the extent they are supported by the record.

staff.  Mr. Wallace reported, inter alia, dental problems, specifically missing teeth and an Open Reduction Internal Fixation surgery on his mandible in January 2014 with a steel plate.  (SUF at ¶ 4.)

On October 9, 2014, Mr. Wallace sent a Health Care Request form (hereinafter referred to as a "kite") to the dental department explaining he had "received a severly [sic] broken jaw which now has a plate in it as well as 14 teeth either knocked out or distroyed [sic].  My mouth is always in pain and several teeth on the bottom are nothing more then broken pieces."  He explained that he was seeing an oral surgeon and dentist in Butte "to remove broken teeth & repair my jaw but no teeth on the bottom could be pulled at the time due to my jaw being so weak."  Mr. Wallace stated that he was "hoping to get the rest of these bothersome and painful teeth out if able.  I know I need a lot of dental work done but I just really want the painful ones out."  Dental staff responded the following day telling him he was scheduled for a dental intake exam.  (SUF at ¶ 5; Doc. 26-1 at 56.)

As part of his intake to MSP, Mr. Wallace was also seen by Physician's Assistant (PA) Gerald Henderson on October 9, 2014.  Mr. Wallace reported jaw pain less painful than the pain in his right arm, but greater than the pain in his left leg.  Mr. Wallace was also noted to have a deformity in his jaw.  PA Henderson's

treatment plan based on this intake assessment included ordering Tylenol for pain and to have Mr. Wallace scheduled with Drs. Kohut or Piranian for a pain management plan. (SUF at ¶ 6.)

On October 11, 2014, Mr. Wallace sent a kite to the medical department recounting the pain management referral from his intake physical on October 9 but stating he had pain in his right arm, mouth, and jaw and had not had any medications since arriving. In response, Mr. Wallace was seen by MSP medical staff on October 13 and evaluated pursuant to the Joint Pain Protocol. The staff noted that Mr. Wallace's medications were coming that week. (SUF at ¶ 8; Doc. 26-3 at 17.)

PA Henderson had given Mr. Wallace a one-month prescription for 500 mg of acetaminophen (two tablets, three times daily) to be kept on his person at the October 9, 2014 intake exam. (SUF at ¶ 7.) That prescription, however, was not filled until October 16, 2014. (SUF at ¶ 9.)

On October 27, 2014, Mr. Wallace sent a kite to the dental department requesting an appointment and stated he had "serious jaw & teeth, injury & pain issues." He explained that his "teeth are in a lot of pain & lately in my sleep I have been clenching my jaw & waking barely able to eat." The response on October 29, confirmed that he was scheduled for a dental intake exam. (SUF at ¶

7

10; Doc. 26-1 at 55.)

On November 13, 2014, Mr. Wallace again sent a kite to dental and reported that overnight a large chunk of his tooth had broken away and the nerve was exposed. He asked for dental to look at his tooth. Mr. Wallace was evaluated pursuant to the Dental Condition protocol on November 14, 2014. Medical staff noted that Mr. Wallace would be referred to a dental provider within five days and they gave the cage officers 30 tablets of Ibuprofen 200 mg/acetaminophen 325 mg for Mr. Wallace. The November 17 written response to Mr. Wallace's kite noted he was scheduled. (SUF at ¶ 13.)

On November 18, 2014, Mr. Wallace filled out a medical history for his dental appointment. Under "other medical/problems conditions[,]" he noted "broken bones, broken jaw," and that he was taking 3,000 mg of acetaminophen daily "for pain." On his Comprehensive Treatment Plan form, under "any dental problems/pain[,]" Mr. Wallace responded, "yes, missing & broken teeth – result of accident." In the "Areas of concern[,]" Mr. Wallace wrote, "missing & broken teeth Top & bottom." (SUF at ¶ 14.)

At Mr. Wallace's initial dental appointment on November 19, 2014, Dr. Hash noted that Mr. Wallace had a fractured mandible 22-24 and 25-27 area and bilateral maxillary fractures. Dr. Hash recommended Mr. Wallace be seen again in

1-3 weeks.  (SUF at ¶ 15.)[2]  The initial treatment plan for Mr. Wallace based upon

the November 19, 2014 visit included restoring the broken and decayed teeth

along with a periodontal treatment plan.  (SUF at ¶ 17.)

On December 13, 2014, Mr. Wallace sent a kite stating:

> Ever sense [sic] my accident on Jan 3rd 2014 I have had pain from
> time to time in my right ear from where my upper right jaw was
> broken & pushed up into my ear drum.  I have been having pains in
> my ear the past few days & would like to have my ear looked at to see
> if its is swollen or inflamed.  The nurse "Pat" checked it about 6
> weeks ago & it was red & irritated then but now it feel worse &
> muffled sounding at times like its clogged.

(Doc. 26-1 at 50.)  The response indicated that Mr. Wallace was assessed.  It also

said, "Wallace you are scheduled to get a few things done, none of it has to do

with your ear.  When your name comes up, they will call you in."  (Doc. 26-1 at

50.)  Mr. Wallace was seen by medical on December 14, 2014 and the patient care

protocol form has a note on it that says, "Will Dental take a Look??"  (Doc. 26-1

at 51.)

On February 9, 2015, Mr. Wallace sent a kite to dental stating:  "I am

having a lot of pain & numbness in my front lower teeth & jaw been having a lot

---

[2]The Court notes that there is a "TMJ" section on the Comprehensive Treatment Plan form.
The questions regarding restrictions to opening, muscle pain, asymptomatic, clicking/popping
and pain on opening/closing were left blank.  In the notes portion of that section it states:
"multiple fractures.  Teeth numb 25-27 area, but not tip or chin."  (Doc. 26-1 at 5.)

of problems & sensitivity with these areas sense [sic] my jaw was broken & other teeth knocked out on 1-3-14."  The February 12, 2015 response indicated that he was scheduled.  (Doc. 26-1 at 47.)

Between January 2015 through May 2015, Mr. Wallace was seen by the dental department five times.  On January 8, 2015, Mr. Wallace sent a kite to dental stating:  "I have a bone fragment pushing through the roof of my mouth & it hurts very very badly.  Could you please investigate as soon as possible?"  (Doc. 26-1 at 49.)  On January 13, 2015, Mr. Wallace sent a kite to dental indicating: "About a year ago I was in a accident which caused me a broken jaw & many teeth to be knocked out or broken.  I have been having a lot of pain in a few teeth & others are overly sensitive.  Could I please be seen by dental?"  (Doc. 26-1 at 48.) On January 15, 2015, Mr. Wallace was seen for a sharp pain under his gums in the maxillary anterior edentulous area by Dr. Brent Goldthorpe.  Mr. Wallace declined the surgery offered to explore the problem.  (SUF at ¶ 19.)[3]

On February 17, 2015, Dr. Jake Starr, DDS saw Mr. Wallace regarding sensitivity with his lower anterior teeth which were determined to have irreversible pulpitis and would require root canal therapy.  The root canals were

---

[3]The Court notes that Dr. Goldthorpe indicated in his January 15, 2015 notes, "mild occlusal adjustment #21 occlusal due to complaint of soreness when he wakes up clenching/grinding all night."  (Doc. 26-1 at 9.)

completed by Dr. Starr on April 6, 2015.  (SUF at ¶ 19.)

On April 25, 2015, Mr. Wallace sent a kite to dental stating:

The last time I was at dental I was #217 on the list to get my partials & teeth fixed.  I am writing to see if there is any way possible to get this done sooner.  All my life I have dealt with major anxiety & self esteem issues & ever since I was run over by a cop car on Jan 3rd 2014 & had my jaw broken & my theeth [sic] knocked out I've dealt with severe mental issues over the way I look & feel.  I can barely eat without food falling out of my mouth.  I always have some sort of pain in my mouth & jaw.  I now snore & drule [sic] badly.  Is there any way you can please help me sooner.  I'm begging.  Thank you for your time.

(Doc. 26-1 at 43.)  He received the following response on April 27, 2015,

"Wallace, We don't jump people around you are scheduled for you cavities and

your partial also.  When its your turn they will call you in.  If we jumped you up

on the list we would have to do it for everyone, and that's not gonna happen."

(Doc. 26-1 at 43.)

On May 10, 2015, Mr. Wallace sent a kite to dental stating:  "I wrote dental

last Wednesday about some pain & swelling in my lower jaw.  The area around my

break & where my jaw was screwed together.  The pain & sensitivity is a lot worse

now.  Could I please see dental about this issue?"  (Doc. 26-1 at 42.)

On May 12, 2015, Mr. Wallace was seen by Dr. Goldthorpe regarding pain

in the tooth he had seen Dr. Goldthorpe about in January.  Dr. Goldthorpe

determined the tooth had slowly gone necrotic.  Dr. Goldthorpe recommended

RCT (presumably "root canal treatment") but Mr. Wallace opted for extraction of

the tooth.  The extraction was done that day and Mr. Wallace was given

prescriptions for pain medications afterwards.   (SUF at ¶ 19.)  On May 28, Mr.

Wallace was seen for the first stage of his periodontal treatment by a hygienist.

(SUF at ¶ 19.)

On June 9, 2015, Mr. Wallace sent a kite to dental stating:

> Today I saw PA Griffin about the recent yet constant pain in my ear
> and upper jaw.  PA Griffin looked me over and told me I have a bad
> case of CMG [sic] I believe he called it.  Where my upper jaw as a
> result of being broken is grinding, popping, and moving is causing
> the pain in and around my ear.  He told me to write dental sense [sic]
> it is a jaw issue and not a medical issue.  Could you please help me?
> Thank you for your time.

(SUF at ¶ 20; Doc. 26-1 at 40.)  The response, dated the following day, informed

Mr. Wallace, "I scheduled you for a consult.  See you soon."  (SUF at ¶ 20.)

On June 16, 2015, Mr. Wallace was seen in the dental department pursuant

to his June 9, 2015 kite.  His chief complaint was right ear tenderness and a sore

jaw.  Dr. Greg Christensen evaluated Mr. Wallace and noted crepitus in the right

temporomandibular joint (TMJ) from the January 2014 incident.  Dr. Christensen

indicated he wanted Dr. Sims to consult on TMJ and crepitus the next time Dr.

Sims was at MSP.  (SUF at ¶ 22.)  Dr. Paul Sims is an oral surgeon from Butte

who contracted with MSP to see in-house complicated surgical cases and to

provide consultations on pathology, difficult surgical cases, and

temporomandibular joint cases.  (SUF at ¶ 23.)

On July 10, 2015, Mr. Wallace was evaluated by Dr. Sims.  Dr. Sims noted

in the chart that Mr. Wallace had bilateral TMJ "condyle fractures that were not

treated with closed reduction," his impression was that Mr. Wallace's pain

following his prior jaw surgery was from these condyle fractures.  Dr. Sims's plan

was to refer Mr. Wallace to Dr. Clark Taylor "for TMJ evaluation including cone

beam scan and to consider surgery."  (SUF at ¶ 24.)  Dr. Taylor is an oral surgeon

in Missoula who takes care of complex TMJ surgeries.  (SUF at ¶ 26.)

On a "MT DOC Dental Services Request" form dated July 10, 2015, Dr.

Sims's provisional diagnosis was: "S/P condyle fracture.  May need surgical repair

and TM joint reconstruction."  (SUF at ¶ 25.)  Dr. Sims requested that Mr. Wallace

been seen by Dr. Taylor for right TMJ evaluation and likely a Cone Beam Scan.

The form indicated that Mr. Wallace had crepitis with limited opening with pain.

(SUF at ¶ 25; Doc. 26-1 at 67.)  The "MT DOC Dental Services Request" form

(Doc. 26-1 at 67) indicated Dr. Hash approved this referral on July 27, 2015 but

the "MSP Referral Form" (Doc. 26-3 at 30) indicates the date the referral was

authorized was July 10, 2015.

On September 23, 2015, Mr. Wallace kited dental stating:

> A couple months ago I was seen by Dr. Paul Sims about my painful
> TMJ issue occurring from my accident nearly 2 years ago.  I was
> referred to an oral surgeon in Missoula but have yet to be seen.  My
> jaw & ear area have been bugging me & hurting quite a lot lately.  Is
> this normal or can anything be done?

(SUF at ¶ 30; Doc. 26-1 at 39.)  The response the following day informed Mr.

Wallace his appointment was confirmed.  (SUF at ¶ 30.)

According to Dr. Hash, it is not uncommon for it to take two to three

months, after he submits an approved Request form, for the actual appointment to

be finally arranged by the outside-medical scheduler.  Dr. Hash explained that this

is due to, inter alia, security and logistical issues with transportation and

availability of the provider.   (SUF at ¶ 31.)

On October 15, 2015, Mr. Wallace was taken to Missoula to be evaluated by

Dr. Taylor.  (SUF at ¶ 32.)  Dr. Taylor's plan was as follows:

> A right temporomandibular joint MRI scan is recommended. After
> review of such and if confirmatory of our clinical impression, the
> patient will be a candidate for right temporomandibular joint
> arthroplasty with autogenous dermal/fat meniscal reconstruction. We
> will be awaiting receipt of MRI scan.

(SUF at ¶ 33.)  Dr. Taylor's evaluation notes were sent to MSP on October 21,

2015.  (SUF at ¶ 34.)

On November 3, 2015, Mr. Wallace kited to dental asking, inter alia, for an

14

appointment to "talk about Dr. Taylor's report[.]"  The November 9 response

noted he was "Scheduled. See you soon."  (SUF at ¶ 35.)  On November 10, 2015,

Dr. Starr met with Mr. Wallace to discuss Dr. Taylor's report and

recommendation.  Dr. Starr reviewed Dr. Taylor's exam notes, diagnosis, and

proposed surgical intervention pending presurgical MRI and DOC approval.  (SUF

at ¶ 36.)

On that same day, Dr. Starr submitted two Dental Services Request forms.

(SUF at ¶ 37.)  The first request was for an MRI of Mr. Wallace's right

temporomandibular joint to be performed at Deer Lodge Medical Center based on

Dr. Taylor's request.  Dr. Starr noted, "After initial consultation, Dr Taylor wanted

MRI prior to making final determination on surgery.  Please MRI to Dr. Taylor."

(SUF at ¶ 38.)  Dr. Hash testified that the request for the MRI was approved the

same day.  (SUF at ¶ 39.)[4]

Dr. Starr's second request was for TMJ Surgery/Treatment of Mr. Wallace's

right temporomandibular jaw by Dr. Taylor.  According to Dr. Starr, this request

was contingent on what the MRI showed and if the MRI did not show a need for

---

[4]The Court notes that in the "MT DOC Director Dental Services" section of the November 10, 2015 request for an MRI there is no indication that the request was approved, not approved or on hold.  It just states in the comment section "bilateral TMJ MRI no contrast."  (Doc. 26-1 at 65.)

further surgery, the request would be unnecessary.  (SUF at ¶ 40.)

Mr. Wallace was seen on November 17, 2015 for gross caries removal, placed pulpcalp, and temporary filling on a tooth.  Mr. Wallace was prescribed and given Clinpro 500 toothpaste to treat reported sensitivity.  He was seen again on November 24, 2015 for an annual appointment by Dr. Christensen for his phase II periodontal treatment and recall exam.  (SUF at ¶ 41.)  There is an indication on the notes from the November 24, 2015 appointment to "review MRI results when we get them."  (Doc. 26-1 at 10.)

On December 10, 2015, Kendra Kessen from Dr. Taylor's office e-mailed Dr. Hash stating:  "Just following up on a patient you had referred to us, Dale Wallace.  After his consultation, Dr. Taylor had recommended he get a BL TMJ MRI to further evaluate the joint.  Has that been scheduled/done by any chance?" (Doc. 26-2 at 1.)  On January 11, 2016, Dr. Hash forwarded Ms. Kessen's December 10, 2015 e-mail to himself as a reminder to respond after the holidays. (SUF at ¶ 42.)

On December 27, 2015, Mr. Wallace kited dental saying,

A few months ago I was seen by Dr. Taylor in Missoula & Dr. Taylor wanted me to come back & get an MRI done.  He said I do definitely do need surgery.  Over the past month or so my jaw has been hurting more & more.  Every time I open or close my mouth to eat, talk, yawn etc. my jaw pop, cracks & grinds.  The pain medications I have been

> on are becoming less effective as time goes on & the cold weather
> definitely isn't helping either.  I don't know what can be done but I
> would like to ask & make sure the appt with Dr. Taylor has been
> made.

(SUF at ¶ 43, Doc. 26-1 at 36.)  Despite Defendants' representation that the

request for the MRI was approved on November 10, 2016 (SUF at ¶ 39), the

response, on December 29, told Mr. Wallace the request had been submitted and

was "waiting for Director's approval."  (SUF at ¶ 43.)

On January 6, 2016, Ms. Kessen e-mailed Dr. Hash again stating:  "Just

checking in again on our patient, Dale Wallace.  Is the BL TMJ MRI that Dr.

Taylor being ordered, or has it already been done?  Just trying to make sure we

don't loose [sic] track of any patient needs.  Thanks for your help!"  (Doc. 26-2 at

2.)

Dr. Hash responded on January 13, explaining that the scheduling team still

had not scheduled the MRI but said it would be scheduled soon.  He then said,

"Let me know if there is a sense of urgency concerning this."  Ms. Kessen told Dr.

Hash, "There is no urgency for the imaging, I was just hoping to make sure I

didn't lose him in follow up for my peace of mind."  (SUF at ¶ 45; Doc. 26-2 at 3.)

On January 6, 2016, Mr. Wallace submitted a kite stating:

> Over two years ago I was in a accident where my jaw was broken & a
> few of my teeth were shattered.  I am having a lot of pain & limited

17

movement in my jaw.  I am sapost [sic] to be seeing Dr. Taylor to get
an MRI done before my surgery.  It's been months sence [sic] I last
saw Dr. Taylor & my jaw has been getting worse & worse.  Any idea
what's going on?  Also how far out am I on the list to get partial
done?

(SUF at ¶ 46, Doc. 26-1 at 35.)  On January 14, 2016, the dental staff responded,

"We have you scheduled for an MRI getting appointments can take time.  Thank

you."  (SUF at ¶ 46.)

On February 3, 2016, Mr. Wallace sent a kite to dental stating:

I am writing to ask what number I am on the list to get partials.  It has
been over 2 years sense [sic] I had my teeth knocked out & my jaw
broken.  Having to chew on my back teth is causing my jaw a lot of
pain & discomfort.  I am still awaiting surgery from Dr. Taylor but
not having teeth aren't helping.

(Doc. 26-1 at 34.)  On February 8, 2016, dental staff responded, "You are #138 on

our denture list."  (Doc. 26-1 at 34.)

On February 9, 2016, Mr. Wallace was taken to Big Sky Diagnostic

Imaging in Butte for a non-contrast MRI of his temporomandibular joints.  (SUF

at ¶ 47.)  Dr. Jesse A. Cole's February 10, 2016 opinion regarding the MRI

findings was:

Severe degenerative change of the right mandibular condyle and
remodeling of the temporal eminence with limited range of motion
but not meniscal trapping with jaw opening.  Mild osteoarthritis of
the left mandibular condyle.

(SUF at ¶ 48.)  On February 16, 2016, Dr. Cole's report of the MRI was

transmitted to MSP.  MSP, in turn, immediately sent the report to Dr. Taylor's

office.  (SUF at ¶ 49.)

On February 29, 2016, Mr. Wallace kited dental and stated:

A few weeks ago I went to Butte & finally got the MRI done on my
jaw to see the extent of the damage for my surgery.  It has been over 2
years since my jaw was broken & my teeth knocked out.  I am
constantly in pain & my jaw seems to be getting worse & worse &
with not having any teeth in the front I am forced to chew on my back
teeth which hurts more as well.  I am writing to see what the next step
is & how much longer am I to be patient without relief?

(SUF at ¶ 50, Doc. 26-1 at 33.)  Dental staff responded on March 2, "I am talking

with Dr. Taylor and the dentist.  We will schedule you soon to bring you up and

discuss what's going on." (SUF at ¶ 50.)  Also on March 2, 2016, Crystal Leaver

noted in Mr. Wallace's chart that she "[s]ent Dr. Taylors [sic] office an email

following up on diagnostic after MRI scan."  (SUF at ¶ 51.)

On March 20, 2016, Mr. Wallace kited dental stating:

A little over 2 years ago my jaw was severely broken & a bunch of
my teeth were broken or knocked out.  Since then I have had nothing
but pain & problems with my teeth & jaw.  Lately my teeth have been
extremely sensitive & painful & its only getting worse with time.
Chewing food is hard & cold/hot are really bad.  Is there anything that
can be done?

(SUF at ¶ 52, Doc. 26-1 at 32.)  Dental staff responded on March 22, 2016 saying,

"We are talking with Dr. Taylor about your jaw.  You are treatment planned for fillings and your name is nearing the top of the list."  (SUF at ¶ 52.)  Mr. Wallace was seen by Dr. Starr on March 29, 2016 and May 10, 2016 for additional routine restorative dental treatment.  (SUF at ¶¶ 54.)

On May 27, 2016, Mr. Wallace kited dental and asked "if there is any new info about the surgery on my jaw from Dr. Taylor?  My jaw is hurting more & more over time.  It has been 2 1/2 years since this injury & the pain grows week by week."  Dental staff responded May 31, saying, "We will look into it and call you up to finish your work and discuss what we find out."  (SUF at ¶ 55; Doc. 26-1 at 30.)

On June 1, 2016, Kelly Bigelow from Dr. Taylor's office e-mailed Dr. Starr regarding billing of the facility and surgeon fees, but noting a problem with the anesthesiologist fee, saying it "would be an additional $1500 fee.  Would this be covered for us by the state from your end?"  (SUF at ¶ 56.)  On June 2, 2016, Dr. Christensen noted in Mr. Wallace's chart, "Emails sent to Dr. Hash/Crystal regarding follow up tx at Dr. Clark Taylors [sic].  Follow up on emails sent." (SUF at ¶ 57.)

On June 6, 2016, Dr. Starr forwarded Ms. Bigelow's inquiry about the anesthesiologist's fee to Connie Winner, noting Mr. Wallace "is the inmate Dr.

Taylor was in mid treatment on when the Medicaid switch happened[,]"[5] and

asking how to respond to Ms. Bigelow.  (SUF at ¶ 58.)  Connie Winner is the

Administrator of the Clinical Services Division of the Montana Department of

Corrections.  (SUF at ¶ 50.)  The June 6, 2016 e-mail forward from Dr. Starr was

the first time Ms. Winner became aware that Mr. Wallace was being treated by Dr.

Taylor and would be having jaw surgery.  (SUF at ¶ 60.)

In response to Dr. Starr's June 6 inquiry regarding payment of the

anesthesiologist, Ms. Winner sent the inquiry to Cindy McGillis-Hiner and asked

her how to resolve the issue.  Ms. McGillis-Hiner spoke to Dr. Taylor's office and

reported back,

> Here is the issue:  the anesthesiologist this office utilizes is from
> Denver and is not covered under Medicaid in Montana. Dr. Taylors
> [sic] office is requesting the Department of Corrections approve to
> pay for the anesthesiologist that is not covered through Medicaid.
> Please review and advise how you would like to proceed.

(SUF at ¶ 61.)  The June 6, 2016 e-mail forward from Ms. Winner to Ms.

---

[5]In 2015, Montana's Legislature passed Senate Bill 405 (SB405), known as the HELP Act or
colloquially as Medicaid expansion.  One of the effects of SB405 was to bring inmates under the
Medicaid umbrella, and thus DOC's payment for inmate medical care was also shifted to that
same system.  Outside medical providers had been being paid under a fee structure handled by
Blue Cross Blue Shield, but the bill mandated that DOC reimburse health care providers for
services at the Medicaid rate, regardless of whether the offender is currently
Medicaid eligible.  In other words, the shift meant outside providers now needed to be Medicaid
providers, or accept payment under the Medicaid fee structure in order to work with DOC.  On
January 1, 2016, these changes to Medicaid billing and payment for services provided to DOC
offenders went into effect.  (SUF at ¶ 63.)

McGillis-Hiner was the first time Ms. McGillis-Hiner became aware of Mr.

Wallace's jaw surgery.  (SUF at ¶ 62.)

In response to this explanation, Ms. Winner asked Ms. McGillis-Hiner

whether there was an anesthesiologist in Montana who took Medicaid.  Ms.

McGillis-Hiner responded that Dr. Taylor's office told her this was the only

anaesthesiologist they used at their practice.  (SUF at ¶ 64.)  In this reply e-mail,

Ms. Winner included Dr. Hash in the conversation.  This is how Dr. Hash learned

that Dr. Taylor's office had determined to proceed with surgery after review of the

MRI.  (SUF at ¶ 65.)

On June 7, 2016, Mr. Wallace sent a kite "about the constant pain and

discomfort I am constantly in due to my still broken right arm and my still broken

jaw."  With regard to his jaw, Mr. Wallace went on,

> I saw Dr. Taylor last sep. and he said I definitely need surgery to fix
> my jaw. Here it is 9 mo later and I still have yet to be seen about this
> issue.  Medical knows I have all these broken bones still and that I am
> constantly in pain yet all I am getting is slow played and put off…

On June 10, 2016, Melissa Scharf the Director of Nursing (DON) responded,

telling Mr. Wallace, about his jaw, "Will make sure your jaw issues are addressed

and a plan of care discussed with you."  (SUF at ¶ 66.)  Consistent with her

response, on June 10, 2016, Ms. Scharf also instructed that Mr. Wallace be

scheduled to discuss his MRI results.  (SUF at ¶ 67.)

On June 29, 2016, Mr. Wallace was seen in the MSP Infirmary.  Dr. Tristan Kohut noted Mr. Wallace was prescribed tramadol for chronic pain and gabapentin for "neuro pain," and observed, inter alia, that Mr. Wallace "has arthritis in the jaw joint and continued pain orally."  Dr. Kohut renewed the tramadol prescription for six months and for the jaw complaints wrote, "Jaw complaints.  Oral surgery? Need? Will discuss @ Sp Needs."  (SUF at ¶ 68; Doc. 26-3 at 16.)

On July 11, 2016, Mr. Wallace kited regarding when he would be "fitted for [his] teeth" and asking about "the status on [his] broken jaw being fixed."  He explained that, the longer & longer my jaw stayes [sic] broken the more constant pain & discomfort I am in.  Also having no front teeth forces me to chew on my back teeth which hurts my jaw more & more."  Dental staff responded on July 12, 2016, telling him his wisdom tooth extraction was still scheduled and "[w]e are still talking with Dr. Taylor's office. We will let you know what's going on." (SUF at ¶ 69.)

On July 13, 2016, Ms. McGillis-Hiner sent an e-mail to Dr. Hash and Ms. Winner asking if there had been a decision about the anesthesiologist issue.  Dr. Hash responded he had called Dr. Taylor's office about it but they had not called back yet.  (SUF at ¶ 70.)  When Dr. Hash heard back from Dr. Taylor's office that

23

same afternoon, they indicated they were questioning whether they would be able to accept Mr. Wallace because of the Medicaid payment restrictions that came about in January 2016 with Medicaid expansion.  Based on what Dr. Taylor's office told Dr. Hash, he asked the dental clinic to put Mr. Wallace on his follow-up list for the coming Monday when he would be at MSP so he could discuss with Mr. Wallace what he learned about surgery.  (SUF at ¶ 71.)

On July 14, 2016, Ms. Winner e-mailed Dr. Hash and Ms. Hiner, as well as Russ Danaher and Crystal Leaver, with a new idea:

> I would recommend that we investigate if there is another oral surgeon/anesthesiologist that can perform this work—one that will accept Medicaid rates. If we need to look in Butte, Missoula, Helena, etc., that is what we will need to do. We cannot agree to a non-Medicaid rate payment without first exhausting all of our options.

(SUF at ¶ 76.)  Dr. Hash responded that he would look into it on Monday.  (SUF at ¶ 78.)

In Dr. Hash's opinion going to another surgeon was disfavored in Mr. Wallace's case for several reasons.  First, Dr. Taylor was uniquely qualified for TMJ surgery.  Dr. Sims told Dr. Hash that he did not feel he could take care of Mr. Wallace's case.  In addition, other oral surgeons in the area had indicated to Dr. Hash that they send their TMJ patients to Dr. Taylor.  (SUF at ¶ 74.)  Secondly,

Dr. Hash was concerned about continuity of care.  It can be difficult to get a new

provider to accept a patient when another provider has already started treatment.

In Dr. Hash's opinion, an overarching goal of all treatment decisions is to maintain

continuity of care.  Mr. Wallace had already established care with Dr. Taylor.  Dr.

Hash also wanted to discuss with whether there were any work-arounds related to

this new reimbursement schedule.  (SUF at ¶ 75.)

On July 19, 2016, Ms. Winner asked Dr. Hash for an update on Mr.

Wallace's case.  Dr. Hash responded on July 20, 2016 indicating that he had

spoken to Dr. Taylor's office and they were going to provide total cost estimates

and "[i]f possible, can we discuss this further on MON after I receive the

information[?]"  (SUF at ¶ 79.)  Ms. Winner clarified the following day, July 21,

2016, that she was asking about other anesthesiologists in Montana who would

accept the Medicaid rate, not about cost estimates.  Dr. Hash, responded, "Yes, but

not at Dr. Taylor's office.  Multiple factors that need to be reviewed concerning

this case.  If possible let's discuss this on MON."  (SUF at ¶ 80.)

On July 20, 2016, Riana Skarland from Dr. Taylor's office sent Dr. Hash an

"Estimate of Charges" for Mr. Wallace's treatment.  (SUF at ¶ 81.)

On July 25, 2016, Dr. Hash met with Ms. Winner, Ms. McGillis-Hiner and

Mr. Danaher to discuss Mr. Wallace's case.  From that meeting, additional

necessary information was identified which Dr. Hash hoped to get in a couple of

days.  (SUF at ¶ 82.)  This additional information included whether Dr. Taylor's

anesthesiologist was specialized in some necessary way that mattered to Mr.

Wallace's case, but more broadly Dr. Hash was trying to research any possible

ways forward to get the surgery covered within the confines of the law.  (SUF at ¶

83.)  On July 26, 2016, Mr. Winner sent an e-mail to Dr. Hash to explain why she

was asking that all avenues of treatment be researched in Mr. Wallace's case.  She

indicated that such research was needed because,

> All state offices, including Department of Corrections, are audited by
> state auditors. They look at the law and our practices. As you all are
> aware, the law states that all medical providers must charge at the
> Medicaid rate. If we do not, I have to explain why. I am comfortable
> explaining why when we have exhausted all avenues--that is, are
> there other providers, dentist/anesthesiologist who will provide the
> services at Medicaid rates.  Medicaid has a list of those who accept
> Medicaid rates. We need to do our due diligence by calling and
> finding out if any will provide the services we need.

(SUF at ¶ 85.)

Attempting to develop a plan for Medicaid coverage for Mr. Wallace's

surgery, Dr. Hash e-mailed Riana Skarland at Dr. Taylor's office on July 26, 2016

asking if it would be appropriate to have the surgery done at the hospital as

opposed to Dr. Taylor's surgery center. (SUF at ¶ 86; Doc. 26-2 at 24.)

On July 29, 2016, Mr. Wallace was seen for his follow-up appointment with

Dr. Kohut regarding the tramadol adjustment and arm pain.  Mr. Wallace requested an increased dose, but noted it was helping.  Dr. Kohut also noted, "Pt had MRI. Will have Dental Review MRI for TMJ."  Dr. Kohut saw Mr. Wallace for a follow-up appointment regarding the tramadol adjustment and arm pain. Thus, a copy of Dr. Kohut's instruction for dental to review the MRI of Mr. Wallace's jaw  was passed to the dental department.  (SUF at ¶ 87.)  On August 1, 2016, the dental department received Dr. Kohut's referral and notified Dr. Hash.

According to Dr. Hash, neither Dr. Kohut or Dr. Rees had much to do with Mr. Wallace's case.  He did not consult with either doctor, but was aware Mr. Wallace was receiving pain management treatment by the medical department for a variety of issues.  Neither physician was consulted about how to treat Mr. Wallace's dental condition nor involved in the decisions regarding Mr. Wallace's consultation with Dr. Taylor or scheduling the jaw surgery.  (SUF at ¶ 89.)

The discussions of Mr. Wallace's case continued into August 2016.  On August 1, 2016, Dr. Hash e-mailed Dr. Taylor's office requesting they contact him about Mr. Wallace's case.  (SUF at ¶ 91.)  Later that day he met with Ms. Winner, Ms. McGillis-Hiner, and Mr. Danaher about Mr. Wallace's case to discuss what information Dr. Hash had gathered and the other ideas for getting Medicaid coverage he had posed and was exploring.  (SUF at ¶ 92.)

On August 8, 2016, Dr. Hash e-mailed Riana Skarland at Dr. Taylor's office to ask whether she had heard from Dr. Taylor about his idea that Mr. Wallace's surgery be done in the hospital.  (SUF at ¶ 93.)  Ms. Skarland wrote back later stating:

> I guess Dr. Taylor discussed the case with our office manager Cheryl. The plan is to get our new anesthesia doctor credentialed with Medicaid and do the surgery after that in our office. They are shooting for October 1st.

(SUF at ¶ 94.)

On August 27, 2016, Mr. Wallace kited dental asking "what if any progress has been made regarding [his] broken jaw and getting it fixed."  He stated,

> It has been over 2 1/2 years since my jaw was broken.  I am in constant pain & discomfort & since my front teeth were knocked out during the same accident & with no front teeth I am forced to chew on the back teeth which only put more stress & pain on my broken jaw.  What if anything is being done about this?

(SUF at ¶ 96, Doc. 26-1 at 27.)  On August 31, 2016, dental staff responded, "I have you scheduled to talk to a dentist about what's going on."  (SUF at ¶ 96.)

In late August, Dr. Hash started to doubt the viability of having Dr. Taylor continue his care of Mr. Wallace and in September 2016 he began to contact and leave messages with other surgeons.  On September 19, 2016, Dr. Hash made a last attempt with Dr. Taylor's office.  (SUF at ¶ 95.)

28

On September 13, 2016, Mr. Wallace sent a kite recounting his jaw pain,

stating:

> I am having more & more constant & sharp pain in my jaw.  I kite
> medical & I count [sic] dental & time & time I'm told to be patient.  I
> have been patient for over 2 1/2 years sence [sic] the police ran me
> over & caused me these broken bones I am still dealing with.  How
> long must I be patient while my jaw continues to hurt & noticeably
> separate my teeth since my jaw is not connected to my upper right
> dish joint.  2 specialists have said to MSP staff that I need corrective
> surgery & still I am not being seen or told anything.  I find it medical
> neglect that I have been waiting so long yet a guy in my unit runs his
> mouth & starts a fight, gets beet up & in less than a month he is seen
> & already has surgery & his isn't as serious as mine.  If I were to get
> hit in my jaw it could kill me.  It is a safety and health issue and still
> medical is not addressing my situation.  Could I be seen & get my
> broken jaw addressed.

(SUF at ¶ 98; Doc. 26-3 at 37.)  Ms. Scharf responded on September 16 that it is

"being addressed and you will be seen to discuss the plan."  (SUF at ¶ 98.)

On a similar kite (dated September 16, 2016, but marked as received by

medical on September 15), Mr. Wallace stated:

> My broken arm and jaw are hurting more and more.  My meds are not
> effective as they once were and it is medical neglect that even after 2
> outside specialists have stated I need corrective surgery I am still
> sitting here in pain and broken bones.  This is intentional medical
> neglect and I am not receiving fair or equal treatment.  I watched a
> guy get beet up and he is already seen and out of surgery in less than
> a month.  I have had broken bones for 2 years and still medical passes
> me off.  Melissa Sharf even told me that my case feel threw [sic] the
> cracks and was forgotten about.  That was six months ago and still no
> teeth, a broken jaw, & a broken arm.  What is going on?  Why are you

intentionally making me suffer?  All you are doing is adding fuel to a
neglect and indifference suite against my 8th amendment rights.  I
need help.  I am in pain & suffering.  Please help.

(SUF at ¶ 99; Doc. 26-3 at 36.)  On September 16, Ms. Scharf again told Mr.

Wallace, "Your jaw issue is being addressed. You will be seen to discuss the plan

with you."  (SUF at ¶ 99.)  As set forth below, Mr. Wallace was seen by Dr. Hash

on September 20, 2016.  (SUF at ¶ 108.)

After repeated, but unsuccessful, efforts to work with Dr. Taylor's staff, on

September 19, 2016 Dr. Hash contacted Dr. Taylor directly to get answers about

Mr. Wallace's case.  Dr. Hash learned from Dr. Taylor that his anesthetist was

applying for Medicaid provider status, and Dr. Hash explained that this was not,

strictly-speaking, necessary—the anesthesiologist could just agree to accept the

Medicaid rate because that is what DOC would pay. With that explanation, Dr.

Taylor agreed to move forward.  Dr. Hash updated Ms. Winner and Ms.

McGillis-Hiner with his news and Dr. Hash set-up an appointment to see Mr.

Wallace and update him about the surgery.  (SUF at ¶ 100.)

Based on his conversation with Dr. Taylor that same day, September 19, Dr.

Hash approved the Dental Services Request for "TMJ Surgery/Treatment" and

directed the MSP/DOC staff responsible for scheduling appointments with outside

providers to set up Mr. Wallace with Dr. Taylor "when transportation and clinical

time can be coordinated."  (SUF at ¶ 102.)  Dr. Hash, however, inadvertently

checked the "Hold" box of this particular request form but noted in the Comments,

"Approved for TMJ surgery and any needed follow-up care."  (SUF at ¶ 103.)

On the afternoon of September 19, 2016, Dr. Hash e-mailed Ms. Skarland

summarizing what he had discussed with Dr. Taylor stating that if the

anaesthesiologist was willing to accept Medicaid rates there was no need to wait

for the anesthetist's Medicaid provider application and "we can go ahead on the

two cases even though he is not an official Medicaid Provider yet"—and

confirming to her that the referral request for Mr. Wallace had been approved and

submitted.  (SUF at ¶ 104.)

Also on September 19, 2016, Mr. Wallace kited dental and asked where he

was on the list for partial dentures.  He stated:

> I am dealing with constant pain due to my still broken jaw.  I
> understand that there is a waiting list but some cases need to be
> considered.  I have a broken jaw that needs surgery & with no front
> teeth I am forced to chew on my back teeth which puts more strain &
> pain on my jaw.  Due to chewing on my back teeth my jaw is
> separating to a noticeable point where my right side is getting lower
> than the left staring dead middle of my lower teeth.  It is also causing
> my teeth to separate.  I've been told by 2 specialist that I need surgery
> & yet all I keep getting told is to patient.  Medical says kite dental.
> Dental says kite Medical & all the while my pain increases & my jaw
> gets worse.  Someone please help or tell me something.

(SUF at ¶ 108, Doc. 26-1 at 26.)  Dental staff responded the following day, "Seen

31

by Dr. Hash 9-20-16." (SUF at ¶ 107.)  Mr. Wallace had an appointment with Dr.

Hash on September 20, 2016, to go over the TMJ surgery and treatment plan.

(SUF at ¶ 108.)

Despite Dr. Hash's confirmation to Ms. Skarland that treatment had been

approved three days earlier—and that the anesthetist would be paid by DOC at the

Medicaid rate, even if he was not officially a Medicaid provider—on September

22, 2016, Pam Cleaves, Dr. Taylor's billing specialist e-mailed Dr. Hash and

requested additional payment confirmation:

> [C]an I get a written statement, on letter head, that these two patients
> procedures are authorized by the DOC and to be paid by Medicaid at
> the Medicaid rates? Past procedures for inmates has taken a lot of
> work and phone calls to get them covered by Medicaid. With a
> written statement, the chance of getting payment in a reasonable
> manner will be greatly enhanced.

(SUF at ¶ 109.)  Dr. Hash forwarded the request to Mr. Danaher on September 26,

2016.  (SUF at ¶ 110.)

Dr. Hash had a second TMJ surgery consultation with Mr. Wallace on

September 29, 2016.  Dr. Hash briefly discussed Dr. Taylor's plan and [assured]

him things were moving forward, reiterating the complexity of the treatment.

(SUF at ¶ 112.)

On October 13, 2016, Mr. Danaher provided an update to Dr. Hash and Ms.

McGillis-Hiner regarding his ongoing conversations with Dr. Taylor's office.

With the request for payment confirmation on letterhead apparently behind them,

Dr. Taylor's office had moved onto issues about where the surgery would be

performed:

> Pam from Dr. Taylor's office called and asking how we were going to
> proceed with both [INMATE NAME REDACTED] and Mr.
> Wallace's procedure. The Medicaid requirement is for the procedures
> to be done as in-patient. The question was if the DOC wanted to
> override that requirement and have them be done in Dr. Taylor's
> office. After discussing it with Cindy Hiner, in light of the required
> post op care, the decision was made to opt for the inpatient procedure
> for both of them. I called Pam back and let her know. She said that
> was what she thought was best as well given the Medicaid
> requirements.

(SUF at ¶ 116.)

On October 23, 2016, Mr. Wallace kited dental to complain that it had been

five weeks since he saw a dentist about his jaw surgery being approved; he

inquired whether, if the surgery would not be soon, other pain medication was

available.  He indicated that, "my jaw is getting worse & worse & my current

meds do not help."  On October 25, the dental staff responded, "We are scheduling

you for surgery still.  These things take time.  I don't know about time frame.

Please be patient and known that we are trying."  (SUF at ¶ 117; Doc. 26-1 at 25.)

On October 24, 2016, Dr. Taylor's office faxed a package of records to

"Montana DOC" Clinical Services, requesting preauthorization for the TMJ

surgery.  (SUF at ¶ 118.)

On October 28, 2016, Mr. Wallace kited dental stating:

. . . it has been nearly 3 years for me dealing with this constant pain of
having a broken jaw.  Last Sep 2015 Dr. Taylor said I need corrective
surgery & since then I have had no relief or remedy.  MSP Medical
said my case fell threw the cracks & then my case got forwarded to
dental recently.  I keep getting told my surgery is approved &
scheduling & I am sorry to bug you but my surgery has been
"scheduled" since last year.  3 years of having this pain is cruel &
without having teeth I have to chew on my back teeth which hurts my
jaw bone.  My pain meds don't help at all & this constant pain is
effecting my mental health & my quality of life.  Can you help or tell
me anything factual?"

(SUF at ¶ 119, Doc. 26-1 at 24)

Dental staff replied on November 2, 2016 stating:

The provider working on your case is waiting for a slot to open up at
the hospital to schedule your appointment. These things take time,
they are more difficult to schedule in our situation than in other
situations.

(SUF at ¶ 119.)

It was Dr. Hash's understanding that Dr. Taylor's office expected to have

Mr. Wallace's surgery scheduled some time around October, but there continued

to be issues with billing and scheduling from Dr. Taylor's office that impacted the

scheduling of this surgery.  (SUF at ¶ 120.)  On November 14, 2016, Dr. Hash sent

34

a follow-up e-mail to the outside scheduling staff asking about his original

submission from September 19 to get Mr. Wallace set up with Dr. Taylor.  This

time the hang-up from Dr. Taylor's office was due to Dr. Taylor's inability to

actually schedule surgeries at the chosen facility, instead being at the mercy of

another surgeon.  Ms. Tierney responded and recounted her efforts:

> I sent the referral to Dr. Taylor back in September. I have spoken to
> his coordinator Rhianna several times about this patient as well as
> [INMATE NAME REDACTED]. The situation with both these
> gentlemen is that Dr. Taylor said he would do these surgeries but he
> will not do them at his location because he will lose money for the
> anesthesia. Last time I spoke to them about this patient was when we
> sent [INMATE NAME REDACTED] down to them.
>
> The way it was explained to be [sic] is: Dr. Taylor will only do these
> procedures at St. Pat's Hospital so they eat the cost… He does not
> have a surgery schedule at the hospital so he basically has to wait
> until another surgeon gives up one of their blocks and that Dr. Taylor
> does not have anything else scheduled at that particular time. I asked
> his nurse if we should just consider sending them elsewhere to get
> these done in a more timely mannor [sic] and I was told no. Dr.
> Taylor will do the surgeries but I have no tentative dates for them to
> happen on. I'm not sure if you would have better luck than I have had
> but I am open to options. Let me know what you might need from me
> and I will work my magic!

(SUF at ¶ 121.)  Dr. Hash was frustrated by these ongoing hang-ups with Dr.

Taylor's office and on November 14, 2016 he called Dr. Taylor's clinic himself to

see if he could move things along any faster.  (SUF at ¶ 123.)

On November 15, 2016, Dr. Hash saw Mr. Wallace for a consultation to

review Dr. Taylor's treatment plan and discuss again the complexity of the surgery. Dr. Hash requested a follow-up consultation in 2-3 weeks. (SUF at ¶ 124.) At the November 15, 2016 visit, Mr. Wallace and Dr. Hash discussed the fact that the TMJ joint is the most complicated joint in the body. (SUF at ¶ 125.)

Although payment of the anesthetist had already been resolved on September 19, 2016, on December 5, 2016, Dr. Hash e-mailed Ms. Cleaves at Dr. Taylor's office with another, more detailed authorization of Medicaid coverage for general anesthesia. He concluded his message, "The 'Outside Medical' coordinator will coordinate the scheduling, assuming we are now able to proceed with the surgeries." (SUF at ¶ 126.)

On December 8, 2016, Dr. Hash confirmed with the Outside Medical coordinators,

> We seemed to have resolved the Medicaid reimbursement issues related to Inmate Dale Wallace and [INMATE NAME REDACTED]. The two approved dental referral documents from 19 SEPT are enclosed. Please contact Dr. Clark Taylor's office and schedule the two patients as soon as transportation can be arranged.

(SUF at ¶ 128.) Dr. Hash requested that Mr. Wallace be called up to the dental department that afternoon for a quick consultation on that same date. (SUF at ¶ 129.)

On December 13, 2016, Ms. Tierney e-mailed that while she was finally

able to schedule one inmate with Dr. Taylor's office, she was "still getting the run around for Mr. Wallace, Dale and [INMATE NAME REDACTED]." (SUF at ¶ 130.) When Dr. Hash spoke with Ms. Tierney, he learned she was simply not able to move it forward so Dr. Hash decided he would again step in with Dr. Taylor's staff. (SUF at ¶ 131.) On December 19, 2016, Dr. Hash informed Ms. McGillis-Hiner he was "continuing to follow up on surgeries for Dale Wallace and [INMATE NAME REDACTED] at Dr. Clark Taylors [sic] office. I think we are close to being able to schedule them and hope to have it resolved today." (SUF at ¶ 132.)

Dr. Hash's belief the scheduling would be resolved on December 19 stemmed from his efforts started earlier that morning when he called Dr. Taylor's office to discuss what the hang-up was with scheduling. (SUF at ¶ 133.) After that call, Jessica Butler (Dr. Taylor's Practice Administrator) e-mailed Dr. Hash recounting their earlier discussion and providing the billing particulars. Inexplicably, Dr. Taylor's office was again back to the issue of reimbursement rates which had been resolved three months earlier, directly with Dr. Taylor and again just 11 days earlier with Dr. Taylor's billing specialist. (SUF at ¶ 134.) Dr. Hash asked Mr. Danaher to review the details from Ms. Butler. Mr. Danaher responded with additional information, which Dr. Hash sent back to Ms. Butler.

37

(SUF at ¶ 135.)  The materials Dr. Hash sent explained that the payor was

Department of Corrections, not Medicaid, and so it did not matter whether the

anesthesiologist or the facility (or any piece of the puzzle) had been officially

approved by Medicaid or not—DOC would reimburse (at the Medicaid rate) any

approved procedure regardless of whether the provider or facility were approved

by Medicaid.  (SUF at ¶ 136.)

Ms. Butler continued to push back on the billing details saying, "If we can

agree on these facility fees, we can move forward with scheduling."  Dr. Hash

responded by providing Ms. Butler additional information regarding changes to

the billing and repayment system after Medicaid expansion went in to effect and

required DOC to reimburse at the Medicaid rate.  This information seemed to, at

last, resolve the issue.  (SUF at ¶ 137.)

Finally, after receiving the additional information on December 19, 2016,

Ms. Butler replied, "We will move forward with the Medicaid reimbursement for

these two cases, in the interest of times."  (SUF at ¶ 138.)  Dr. Hash quickly

replied,

> THANK YOU, one and all! Please let Dr. Clark Tayler [sic] know
> that we really appreciate it. If I had my way, I would have settled this
> a long time ago. However, the State Legislature, in there [sic] wisdom
> decided on this extremely restrictive reimbursement rate. This State
> Medicaid Reimbursement plan has caused me an excessive amount of

headache and stress.

(SUF at ¶ 139.)  Dr. Hash then also updated the Outside Medical coordinators of

the agreement to move forward and instructed them to finish scheduling Mr.

Wallace's procedure.  (SUF at ¶ 140.)

The following day, December 20, 2016, Ms. Tierney e-mailed Dr. Hash:

> Thank you for all of your assistance in getting Dale Wallace and
> [INMATE NAME REDACTED] scheduled with Dr. Taylor. They did
> finally call me back today and I have … Dale for 1/09/17.

(SUF at ¶ 141.)

Dr. Hash requested Mr. Wallace be scheduled for a quick consultation

appointment that week and the dental staff put Mr. Wallace on Dr. Hash's

schedule for the following day.  (SUF at ¶ 142.)  On December 21, 2016, Dr. Hash

met with Mr. Wallace and informed him the TMJ surgery with Dr. Taylor had

been scheduled.  (SUF at ¶ 143.)

On January 5, 2017, Mr. Wallace was seen by Dr. Paul Rees for a

pre-operation evaluation.  (SUF at ¶ 146.)  Surgeons want to make sure their

patients are medically cleared and stable for surgery, so a medical provider meets

with the patient to review past and current medical issues and make the necessary

determination if the patient is stable for surgery. Dr. Rees cleared Mr. Wallace for

surgery.  (SUF at ¶ 147.)

On January 9, 2017, Mr. Wallace was transported to Dr. Taylor's office in Missoula, MT for the TMJ surgery. (SUF at ¶ 150.) When Mr. Wallace returned to MSP after the surgery, he was again in the MSP Infirmary until being discharged back to his unit on January 10, 2017. (SUF at ¶ 151.) Dr. Hash evaluated Mr. Wallace at the infirmary on January 10 and he was doing well. (SUF at ¶ 152.)

On January 17, 2017, Mr. Wallace sent an Offender/Staff Request Form (OSR) addressed to "Dental Staff and Doctors," expressing his gratitude following the jaw surgery:

> Thank you so much for all your hard work and patience. Your professionalism and attention to detail along with your compassion and care for a fellow human being despite status of inmate is admirable and very much appreciated. So thank you so much and keep up the great work . . .

Dental staff responded on January 23, "Your [sic] welcome." (SUF at ¶ 154.)

On January 18, 2017, Dr. Taylor's office faxed instructions for a TMJ work-out for Mr. Wallace. He participated in that rehabilitation through late-February, 2017. (SUF at ¶ 155.)

According to Dr. Taylor, "if the patient chooses to delay surgery, or elects not to have surgical intervention, this does not cause harm or damage to the joint and will not make treatment in the future more difficult. Only when there is a

neoplasm (a tumor, in lay terms) is there a time-sensitive reason or need to pursue surgical intervention." (SUF at ¶ 164.) Dr. Taylor evaluated Mr. Wallace in October 2015 and eventually performed surgery in January 2017. (SUF at ¶ 165.) With regard to this time span, Dr. Taylor says, "Any alleged delay in treatment of Mr. Wallace between my evaluation and the eventual surgery would not have affected his prognosis or outcome." (SUF at ¶ 166.)

Mr. Wallace was prescribed a pain reliever of one sort or another throughout the time he has been at MSP. (SUF, ¶¶18, 44, 145.)

Mr. Wallace began the grievance process regarding his dental care on June 13, 2016 with an informal resolution form. (Doc. 26-4 at 8.) He filed a formal grievance on June 30, 2016. (Doc. 26-4 at 6.) He filed an appeal to the warden on September 9, 2016 and was advised that Dr. Hash would follow-up with him in 2-3 weeks. (Doc. 26-4 at 5.) On September 27, 2016, Mr. Wallace filed an appeal to the corrections director. (Doc. 26-4 at 3.) On October 13, 2016, Ms. Winner responded to Mr. Wallace's Director's Appeal but she mistakenly stated Mr. Wallace's dental issues has been discussed at the MRP. (SUF at ¶¶ 114, 115.)

## III. DISCUSSION

### A. Denial of Medical Care

In order to prove a § 1983 claim for violation of the Eighth Amendment

based on inadequate medical care, a plaintiff must show "acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs."

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Thus, in order to prevail, Mr. Wallace

must show both that his medical needs were objectively serious, and that

Defendants possessed a sufficiently culpable state of mind.  *Wilson v. Seiter*, 501

U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992)

(on remand).

"Dental care is one of the most important medical needs of inmates."  *Hunt

v. Dental Dept.,* 865 F.2d 198, 200 (9th Cir. 1989)(*quoting Ramos v. Lamm*, 639

F.2d 559, 576 (10th Cir. 1980)).  The Court finds and Defendants do not dispute

(MSJ Brief, Doc. 28 at 9) that Mr. Wallace's jaw condition presented a serious

medical need.  Therefore, the issue herein is whether Defendants possessed a

sufficiently culpable state of mind.  The requisite state of mind for a denial of

medical claim is "deliberate indifference."  *Hudson v. McMillian*, 503 U.S. 1, 5

(1992).

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established

a very demanding standard for "deliberate indifference."  Negligence is

insufficient.  *Farmer*, 511 U.S. at 835.  Deliberate indifference is established only

where the defendant subjectively "knows of and disregards an excessive risk to

inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted).  Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  *Id.*

A delayed or denied medical procedure, including surgery, can serve as the basis for a deliberate indifference claim.  *See Hunt.,* 865 F.2d 198 (a delay in receiving necessary dental care can create a genuine issue of material fact); *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (holding that deliberate indifference claim resting on "mere delay of surgery" can survive if the denial caused harm) *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *Egberto v. Nevada Dep't of Corr.*, 678 F. App'x 500, 504 (9th Cir. 2017) (finding triable issue of fact on deliberate indifference claim where MRI was delayed five months without sufficient explanation and doctor recommended spinal injections and there was no evidence that they were

ever administered); *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006)(finding the circumstances "akin to cases finding deliberate indifference where prison officials and doctors deliberately ignore[ ] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner" (*quoting Hamilton v. Endell*, 981 F.2d 1062, 1066–67 (9th Cir. 1992)); *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) ("In short, allegations that a prison official has ignored the instructions of a prisoner's treating physician are sufficient to state a claim for deliberate indifference."); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (per curiam) ("If it is true that prison officials denied Shapley surgery despite the repeated recommendations of Shapley's physicians, Shapley may well have a valid section 1983 action under [*Estelle*].").

"Delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation." *Hunt*, 865 F.2d at 200. But a delay where prison officials are aware that a dental issue is causing severe pain and causing permanent damage are sufficient to state a claim of deliberate indifference. *Id.* In *Hunt*, the prisoner had dentures to compensate for thirteen missing teeth. He lost his dentures during a prison riot and requested replacements in October 1986. In November 1986, Mr. Hunt filed a grievance

44

claiming that as a result of his lack of dentures his teeth were breaking off and his gums were bleeding and becoming infected.  He was not seen until February 1987. Mr. Hunt alleged that prison officials were aware of his bleeding gums, breaking teeth, and inability to eat property, yet failed to take any action to relieve his pain. The Court found these allegations sufficient to state a claim of deliberate indifference.  *Hunt*, 865 F.2d at 200.

While the Court recognizes that Mr. Wallace was provided some dental treatment and pain medications during the delays in this matter, the more than two year delay in obtaining surgery for his extreme jaw issues raises an issue of fact regarding whether Defendant Hash was deliberately indifferent to Mr. Wallace's serious medical needs.[6]

Dr. Hash first encountered Mr. Wallace when he did his initial dental exam on November 19, 2014.  (SUF at ¶ 15.)  Although Defendants argue that Mr. Wallace did not report jaw complaints to a dental provider until June 2015, the record reflects that Mr. Wallace sent a kite on October 27, 2014 requesting to see dental complaining of a serious jaw and tooth injury and pain.  He stated he had been clenching his jaw and waking up barely able to eat.  (SUF at ¶ 10; Doc. 26-1

---

[6]As set forth below, there is insufficient evidence to establish that the remaining Defendants were deliberately indifferent to Mr. Wallace's medical needs, therefore the Court's analysis focuses on Dr. Hash.

at 55.)  On December 13, 2014, he sent a kite complaining about pain in his ear from "where my upper jaw was broken & pushed up into my ear drum."  (Doc. 26-1 at 50.)  He was seen by medical on December 14, 2014 and the patient care protocol form has a note on it that says, "Will Dental take a Look??"  (Doc. 26-1 at 51.)  On February 9, 2015, Mr. Wallace sent a kite to dental stating he was having a lot of pain and numbness in his front lower teeth and jaw.  (Doc. 26-1 at 47.)  On April 25, 2015, Mr. Wallace sent a kite to dental seeking to be moved up on the list to get partials (he was #217) stating that he always had some sort of pain in his mouth and jaw.  (Doc. 26-1 at 43.)  On May 10, 2015, Mr. Wallace sent a kite to dental reiterating the pain and swelling in his lower jaw.  (Doc. 26-1 at 42.)  On June 9, 2015, Mr. Wallace sent a kite to dental stating that he had seen PA Griffin in medical about recent yet constant pain in his ear and upper jaw. According to Mr. Wallace, PA Griffin diagnosed him with a bad case of TMJ (although Mr. Wallace referred to it in his kite at CMG).[7]  Mr. Wallace further stated in his kite that as a result of being broken, his upper jaw was grinding, popping, and moving causing pain in and around his ear.  (SUF at ¶ 20, Doc. 26-1 at 40.)

_____

[7]PA Griffin's medical notes regarding this visit are not in the record, therefore, the Court has relied upon Mr. Wallace's explanation of this visit from his health request form.

46

It was only in response to this last kite that Mr. Wallace was seen by Dr. Christensen on June 16, 2015.  Dr. Christensen referred Mr. Wallace to Dr. Sims. Mr. Wallace saw Dr. Sims on July 10, 2015 and Dr. Sims referred him to Dr. Taylor.  Dr. Hash approved the referral to Dr. Taylor on either July 10, 2015 or July 27, 2015 but Mr. Wallace was not scheduled to see Dr. Taylor until October 15, 2015.  Although Dr. Hash testified that it is not uncommon for scheduling with outside medical providers to take two or three months, there is no specific explanation why it took more than three months to schedule Mr. Wallace with Dr. Taylor after Dr. Sims's July 10, 2015 referral.  There is no evidence regarding when the referral was provided to the scheduling staff and what efforts were made to schedule Mr. Wallace with Dr. Taylor.

After examining Mr. Wallace on October 15, 2015, Dr. Taylor suggested that an MRI be done and if it confirmed his clinical impression, Mr. Wallace would be a candidate for surgery.  Even though the original of Dr. Taylor's report was sent to Dr. Hash, nothing was done regarding this recommendation until Mr. Wallace sent a kite to dental on November 3, 2015 asking to talk about Dr. Taylor's report.  Dr. Starr met with Mr. Wallace on November 10, 2015 and thereafter submitted two dental services request forms, one for an MRI and the other for TMJ surgery.  Although the request for the MRI was approved on

47

November 10, 2015 and Mr. Wallace sent three kites complaining about increased jaw pain, and Dr. Taylor's office sent Dr. Hash two e-mails inquiring about the MRI, and Dr. Hash sent himself a reminder e-mail to deal with the issue after the holidays, the MRI was not scheduled until February 9, 2016.  Again, there is no explanation in the record why it took three months to get an MRI for a patient with painful TMJ which had already been recognized by at least four medical providers (PA Griffin, Dr. Christensen, Dr. Simms, and Dr. Taylor) to get an MRI.  There is no evidence of what efforts were made to schedule the MRI prior to January 2016.

The MRI was done on February 9, 2016 and the report was transmitted to MSP on February 16, 2016 and sent to Dr. Taylor's office.  Again, there is no explanation in the record why Mr. Wallace's case then sat for another four months. During this four months, Mr. Wallace sent three more kites on February 29, 2016, March 20, 2016, and May 27, 2016 complaining about continued and increased pain in his jaw.  It was not until Dr. Taylor's office e-mailed Dr. Starr on June 1, 2016 indicating that Dr. Taylor could proceed with Mr. Wallace's case that movement began on Mr. Wallace's case.  (Doc. 26-2 at 6.)

When Dr. Starr forwarded this e-mail to Connie Winner, that was apparently the first time that Ms. Winner became aware of Mr. Wallace's case.  Once Ms. Winner became involved, the Court cannot say that any named Defendant was

48

deliberately indifferent to Mr. Wallace's serious medical needs.  The record is full of efforts by Dr. Hash, Ms. Winner, and Ms. Hiner to get Mr. Wallace's surgery completed by Dr. Taylor.  Whether it was the Montana Legislature's changes to DOC medical billing or miscommunications with Dr. Taylor's office, there is at least evidence that Defendants were making significant efforts to schedule Mr. Wallace's surgery.

Dr. Hash approved the surgery on September 19, 2016 but checked the hold box.  Thereafter, there appear to have been continued billing and scheduling issues with Mr. Wallace's surgery but again the Court cannot say that Defendants were deliberately indifferent to Mr. Wallace during this time.  All issues were apparently resolved on or about December 19, 2016 and surgery was done on January 9, 2017.

There is insufficient evidence to establish a genuine issue of material fact regarding whether Defendants were deliberately indifferent to Mr. Wallace's serious medical needs between June 2016 and January 2017 when surgery was performed.  The Court has carefully reviewed Mr. Wallace's dental and medical records, dental and medical requests, grievances, and the affidavits of Dr. Starr, Dr. Taylor, Dr. Hash, Ms. Scharf, Ms. McGillis-Hiner and Ms. Winner.  (Docs. 26-1 through 26-10.)  Although it is clear that Mr. Wallace was in significant pain

awaiting his surgery between June 2016 and January 2017, there is significant

evidence that efforts were being made to schedule that surgery.  Although Mr.

Wallace argues that Defendants were simply bickering with Dr. Taylor for seven

months over the $1,500 anesthesiology bill, the issue is clearly more complicated

than that.  The Department of Corrections is obligated to comply with Montana

law as set forth by the Legislature and therefore were obligated to at least

investigate the necessity of the $1,500 fee and determine if it could be paid in such

a way as to comply with the law.  The Court cannot say this constituted deliberate

indifference.  *See  Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) (en

banc)("A prison medical official who fails to provide needed treatment because he

lacks the necessary resources can hardly be said to have intended to punish the

inmate.").

In addition, there is insufficient evidence in the record to establish that

Defendants Kohut and Rees were deliberately indifferent to Mr. Wallace.  Mr.

Wallace's issues were clearly dental in nature and even if Drs. Kohut and Rees

were aware of the situation, they had properly referred that issue to dental.  There

is no basis upon which to find Drs. Kohut and Rees liable under these facts.  These

Defendants should also be dismissed.

As set forth above, however, the Court finds genuine issue of facts

regarding whether Dr. Hash exhibited deliberate indifference to Mr. Wallace's serious medical needs based upon the delays which occurred between June 2015 and June 2016.  Dr. Hash was well aware of Mr. Wallace's situation and his need for additional care at the very least from June 2015 when Mr. Wallace's jaw issues were identified by PA Griffin, Dr. Christensen and Dr. Sims.  The delay of imaging and other treatment between June 2015 and June 2016 is unexplained in the record.  Although Dr. Taylor opined that "any alleged delay in treatment of Mr. Wallace between my evaluation and the eventual surgery would not have affected his prognosis or outcome" (SUF at ¶ 166), there is significant evidence in the record that this delay caused harm–in that Mr. Wallace filed numerous kites and grievances explaining the amount of pain he was in during this delay.

The record is replete with Mr. Wallace's dental kites explaining that he was dealing with constant pain due to his jaw.  He continually complained that he had a broken jaw that required surgery and in addition he had no front teeth.  This forced him to chew on his back teeth thus putting more strain and pain on his jaw and destabilization of his jaw.  He continually asked for partials but was clearly told that he would not be moved up the list for dentures under any circumstances. When he inquired regarding the status of his request for partials in April 2015 he was #217 on the list (Doc. 26-1 at 43), in February 2016 prior to his MRI he was

51

#138 on the denture list (Doc. 26-1 at 34), and on May 23, 2017 he was #46 on

denture list (Doc. 26-1 at 74.)  Thus, the Court finds that Mr. Wallace has

demonstrated sufficient harm caused by the delay in obtaining treatment for his

jaw issues.

In addition, there remains a question of fact regarding whether the delay

affected the success of the surgery.  There was another referral for Mr. Wallace to

see Dr. Taylor in September 2017 because although Mr. Wallace did well after the

January 2017 surgery through March 2017 he started having ear pain and got

progressively worse between March and August 2017.  (Doc. 26-1 at 69.)  Mr.

Wallace had another procedure (joint brisement with arthrocentesis) done by Dr.

Taylor in September 2017.  (Doc. 26-1 at 70.)  Mr. Wallace has also introduced

correspondence with his prior medical providers which at least suggests that the

delay may have attributed to the success of the surgery.  (See Doc. 31-1 at

15–Deveney letter providing verbatim exchange with Dr. Engelstad, stating "So,

his situation (and the delay in care/difficulty in interpretation) made proper

treatment of this injury more difficult, for sure.")  Admittedly, there are

evidentiary concerns regarding Dr. Engelstad's statements but the Court finds that

Mr. Wallace's pain and suffering during the delay in obtaining treatment is

sufficient in and of itself to overcome summary judgment.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

Defendants' Motion for Summary Judgment (Doc. 25) should be GRANTED as to Defendants Winner, Hiner, Kohut and Rees but DENIED as to Defendant Hash with regard to his treatment of Mr. Wallace between November 2014 and June 2016.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[8]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 24th day of June, 2019.

    */s/ John Johnston*
    John Johnston
    United States Magistrate Judge

---

[8]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Wallace is being served by mail, he is entitled an additional three days after the period would otherwise expire.